Case numbers 13-5452, 13-5454, Marilyn Johnson and others, and Fred Acosta v. City of Memphis. Our guests tonight this evening are Ms. Prasad, Mr. Sullivan, and your host, Carl Stapp, please. Before you all get wound up and ready to go, I wanted to talk to them a few minutes about how to proceed in this case, because I noticed Mr. Sullivan took the appellant's seat. And I don't know if that's because the way the argument sheet had this listed or not, but I have two questions for both of you. Does it make sense for Mr. Sullivan, I mean I understand their appeals and cross appeals, but does it make sense for Mr. Sullivan to be in the appellant's chair when you're really the prevailing party on the Title VII claim and for Mr. Britt to be over here as the appellee? That's question one. And question two is, I think we'll be guided by whatever, perhaps, unless my colleagues have ideas, whatever you all think. And can everybody try to, can we get by, and I'm not asking can you get by in a sense, that I'm trying to penalize anybody in argument, but can everybody address all their issues without getting too formal about going back and forth. I mean you've got 15 minutes per side, and of course none of this time is being charged against you all. This is court getting organized time. Do you all have anything to add to that? Okay, so what are the answers to those questions? Well, Your Honor, it makes no difference to the city. I think one of the critical issues is the city's appeal. I think that the reason that Mr. Sullivan is the appellant or the appellee, I think his appeal came in hours earlier than our appeal. And that's how it was documented. But I'm certainly flexible to do whatever the court desires and certainly address whatever issues the court. I don't want to take away from you, Mr. Sullivan, your right to talk twice if you want to. I mean I just ask because it seems to me likely that a fair amount of the attention would be directed toward the Title VII case. I mean there are a lot of other issues. So it's whatever you all think. I don't want to take away your chance to talk twice. On the other hand, it might be advantageous to you to respond to what Mr. Britt has to say on that issue as opposed to otherwise. So whatever, if you all need to take a minute to confer with each other and tell us what you want to do, I'm amenable. I'm just trying to get us in a position so that we can best hear the case and it works best for everybody. Would one possible solution be that we go forward, I anticipated requesting some rebuttal time, and that Mr. Britt in his presentation ask for rebuttal also. That would give us, I think, adequate time. That's fine with me. Does that work for you, Mr. Britt? Does that work for the panel? Yes. Okay. Alright. So you both know you have to divide your time. I just wanted to make sure we got squared away on the front end. Okay. With that in mind then, Mr. Sullivan, I think we're ready to hear from you. Everybody okay with that? May it please the court, my name is David Sullivan. I represent the plaintiffs and with permission I would like to reserve five minutes for rebuttal. This is an employment case involving 85 Memphis police officers. There are multiple challenges. There are 58 African Americans and there are 27 whites. The plaintiffs have raised four issues on appeal in this rather complicated case that's been going on since 2000. So we're in our 14th year now and we've only recently received a final judgment, which brings us to this court. The four issues that the plaintiffs appeal on are the negligence finding in the Johnson 1 case and secondly the denial of lieutenant back pay and retroactive seniority in the Title 7 cases. And then of course there are two issues related to the award of attorney's fees and the district court declined to award the fees for the writ of mandamus to this court. And also the plaintiffs had asked for a fee enhancement. So turning now first to the negligence issue, under Tennessee's Governmental Tort Liability Act, governmental entities are immune from liability for discretionary acts. However, the Tennessee Supreme Court says that that immunity does not apply to operational decisions. And as it relates to this case, the operational decision is guided by pre-existing city laws that require a certain type of promotion test. It's not that the civil service laws require promotion tests. The Memphis civil service laws require a particular quality and type of promotion test. They must be competitive, job related, and they shall be of a practical nature. Now, the district court found that the city enjoyed some degree of discretion in how to administer the test, which we take no dispute with. There is discretion in administering certain types of tests. However, we do think the district court erred when it found that that discretion extended to eliminating the practical test, as the city did in 2000. Simply put, the elimination of the test constituted an act of negligence. The city had no choice. It had to use a practical test. And in fact, the district court, at that time Judge McCall, found in favor of the plaintiffs and granted partial summary judgment finding that the elimination of the practical test made the entire 2000 promotion process invalid. So we have that ruling that shows that this was not a discretionary act. That ruling was not in the context of the government tort liability case, and it was not a ruling on whether the decision to eliminate a practical test was a discretionary function or not, was it? It was in another context in the case. It was a declaratory judgment, yes, Your Honor, interpreting the city laws that the plaintiffs are relying upon to establish that it is not a discretionary function, but it was simply an operational decision. So you're correct, it was in a different context. The validity finding was based on what? That the elimination of the practical test rendered the promotion process not valid, nor did it comply with the requirement of the city law that requires competitive job-related tests that shall be of a practical nature. Now, when I say shall be of a practical nature, I'm quoting directly from the ordinance. In a recent case in 2012, the Tennessee Supreme Court in Giggers v. the Memphis Housing Authority clarified what the court has meant in its prior decisions in determining whether an act is discretionary or whether it is operational. And the court noted that every single operational act carries with it a certain degree of discretion. But just because there is some degree of discretion doesn't render the governmental entity immune under discretionary function, because otherwise that sort of analysis would swallow up the rule and there would be no operational decisions that would subject the governmental entity to liability. Anticipating one of the arguments that the city has made is that the economic loss doctrine would preclude the plaintiffs from recovery. The economic loss doctrine has not been adopted in Tennessee. However, the Tennessee Supreme Court has expressed that it generally agrees with those principles. But that doctrine has no application in this setting. That doctrine applies in products liability cases where the product itself fails but doesn't cause any sort of personal injury or economic loss. So that doctrine just doesn't apply. And what the plaintiffs are asking for, the Johnson plaintiffs, are asking that the summary judgment in favor of the city on the negligence claim be reversed and that the summary judgment motion that the plaintiffs had filed be granted. Next, the African-American plaintiffs were denied lieutenant back pay. Twenty-eight African-American plaintiffs were promoted to lieutenant pursuant to an injunction. That promotion has now been made permanent by a motion that was granted by the district court. Now the district court felt like the lieutenants should not receive back pay because they had not served two years as a sergeant. Well, the whole reason they had not served two years as a sergeant was because of the city's act of discrimination. And in the memorandum opinion issued by the court in 2006, the district court said she must assume that the two-year requirement was more than just a mere formality. Well, in the history of this case, in this setting, it was just a mere formality because when the promotions were made in 2003, the city for the first time in its long history promoted 264 patrol officers to sergeant at one time, even though there was no vacancies for those officers. And the evidence established the city did this because they were afraid that the court would issue an injunction and disrupt the promotions to be made. A hundred officers that were promoted to sergeant actually remained doing sergeant's jobs. They had sergeant stripes, but they had no sergeant responsibilities. And when they took the lieutenant's test in 2005, those individuals were in the same situation that the plaintiffs were in, in that the plaintiffs had not served two years as a sergeant, only because of the city's prior discriminatory history. Let me make sure I understand. These officers who were promoted to sergeant but didn't do sergeant duties, were they then allowed in 2005 to take the lieutenant test? They were. And they were promoted. Is that uncontested? That's uncontested. That was evidence in the case. The other thing is one of the plaintiffs, Verdi McNeil, actually served two years as a sergeant and was denied lieutenant back pay even though she qualified for promotion to sergeant. The plaintiffs after trial and after they were allowed to take the test, the lieutenant's test, put on proof that two other individuals that took the make-up test with them were allowed to take the test, were promoted to lieutenant, and both of those individuals were given lieutenant back pay and retroactive seniority. Are these sort of the two special circumstances, folks? Yes, those were the individuals the court said were extenuating circumstances, whereas the plaintiffs were only exceptional circumstances. We humbly submit that there's really no meaningful distinction between the two in terms of determining back pay. The overarching purpose of Title VII is to make a victim of discrimination whole, and in this setting, these plaintiffs were not made whole. I see that my time is up. Mr. Britt. Thank you, Your Honor. I'd like to reserve two minutes for rebuttal on our appeal issue. And may it please the court, my name is Louis Britt. I'm here with my associate, Dillon King, representing the city of Memphis. This is a kind of complicated situation that we have with the multiple appeals and the cross appeals, and frankly, I was planning to spend most of my time on the city's appeal. I think the issues on the plaintiff's appeal, on the negligence, and the relief granted by the court and the attorney fees are covered in our brief, unless the court has any particular concerns with those issues. I thought you might want to talk about that appeal. That's why I raised the question I did at the outset. Thank you, Your Honor. I do want to talk about that appeal. As the court knows and has recognized, this is a complicated case. I think I had Brown here when it started. But this is a situation, Your Honors, that the city found itself in a very difficult position, a dilemma in 2001, and that's where I'd like to start. In 2001, it found itself in a situation where it had a pending lawsuit over the 2000 test, sergeant's test. It came to light that that test had been compromised. Some individuals had obtained part of the test before it was administered and therefore it was compromised. The city at that time had three choices. Should it stand by the test? Should it try to do some patchwork to substitute a video assessment that was the one that was compromised, the portion of the test, or should it void the test and do it again? The city hired Dr. Dick Jennerett, Richard Jennerett from Houston, Texas, a well-known test developer, renowned, had done many tests throughout the country, a lot in public service and with municipalities in particular. The report, at this time the case was before District Court Judge John McCalla. We had several conferences with Judge McCalla. He went through the process. We had Dr. Jennerett there on multiple occasions. Dr. Jennerett gave his opinion that the test needed to be redone. The city accepted that, asked Judge McCalla to go ahead and void the 2000 test because if he could void it, then we would not have any due process or property interest claims that would result of the 2000 test, and Judge McCalla agreed with that. At that time, Dr. Jennerett produced a report that's in the record. It was a report in May of 2001. This is double-sided copy. It's over 124 pages. It was produced to say, here's the test I recommend. Here's what the city thinks we should do. That was presented to Judge McCalla. Judge McCalla, in fact, had both experts. The plaintiff had an expert as well as Dr. Jennerett attend a hearing in June of 2001 in which this report was reviewed. Judge McCalla had invited any issues. The only issue the plaintiff's expert brought up was the question of will the scoring or the test scoring indicate whether or not the persons promoted in the 2000 test would have an undue benefit on the retest because they would have to retest on the 2002 test. The experts came to a conclusion that that could be evaluated and determined. Everybody was to retest? Everybody. No one was promoted as a result of the compromised test? No, Your Honor. There were initial promotions in 2000. Subject to retesting? Correct, Your Honor. We had some state court litigation ongoing whether or not they had a property interest and could be then demoted. They, in fact, tried to intervene in this case. Judge McCalla held at the April of 2001 status conference that everybody be retested, even the ones that were incumbents at that point. Depending on what the test results were, either they would stay in place or they could be demoted and some were demoted, in fact. But the test format was discussed. Here is the test, what we're going to do. And the test issue about having a video assessment was in the plan. It's in the plan, the 2001 plan. Plus the plan discussed alternatives and why Dr. Gennarette decided these were the proper ways to test. All of that was before Judge McCalla, and on July 2, Judge McCalla issues an order following the status conference which approved the city's motion to go forward with testing as proposed with the modifications of the experts. No other alternatives were put before the city. The city did not refuse to do any other alternative testing. That was the plan. The court approved it. We went through the test, and unfortunately in December of 2002 when all the results were done, the city again faced a dilemma because the test results showed adverse impact. The city was in between a hard place and a rock. What to do? Fast forward a little bit. That set up the results of the test, set up the situation which made the plaintiffs press forward with their Title VII claim and which resulted in the trial before Judge Donald. Correct. What happened, Your Honor? Yes, in December of 2002, the city, after getting the results, before promotions, asked Judge Donald. Judge Donald now had the case. Judge McCalla was not on the case at that time. We asked the court, wanted to advise the court of the findings and had a December 2002 status conference in which Dr. Gennarette was there again and testified again of the results and said we have adverse impact. He's looked at the test. There was no issue there where he could tweak the test and still maintain its validity to eliminate the adverse impact. At that time, the city, as I said, stuck in a hard place and a rock. Does it go forward with a test or does it just throw it away? Because I don't think the city could have done anything else since the court had approved this process. If the city then attempted to change the process after the fact to try to minimize the adverse impact, I think the city would have found itself like Bridgeport, Connecticut did in the Ritchie case. I think this is useful to know. I'm afraid you're going to run out of time and I want to fast forward to ask you what I want to ask you. Absolutely, Your Honor. The argument you make concerning Judge Donald's finding, essentially, if I can try to state it very succinctly, is that the district court accepted the existence of alternatives identified by the plaintiffs instead of requiring proof that the alternatives were equally valid and less discriminatory. Is that... Yes, Your Honor. There's two points to our argument. One is that the district court erred by not applying the correct legal principle, which is the plaintiff's burden to show. That's what I just asked you about. Yes, the plaintiff's burden. There's a second part of that, too, Your Honor. She made a finding that these... after these broad suggestions were made that there were other alternatives, that that would have met the employer's legitimate interest without any analysis whatsoever. And one of the key issues of the standard is there must be...the plaintiff has the burden to show alternatives, equally valid, less discriminatory alternatives. But there's a second part to that that they have to be available. They have to be available and they have to meet the employer's interest. And the court's decision is wrong on both counts. Well, let's...looking at the... Let's assume you're right about the... the inadequacy of the district court's analysis. There was a lengthy record in this case. Presumably, all the evidence has been presented... that could be presented when you had a trial. So, if this court were to find a legal error in the articulation of the reasoning, would the correct result be remanded to the district court for findings on this point, or is the record...is your position that the record is such that, as a matter of law, the court could determine whether or not the plaintiffs had carried their burden? Your Honor, our position... Get me. I do, Your Honor. And our position is that because the court failed to apply the correct legal principle, the court can review this de novo. And looking at the record, this is devoid. The record is devoid, even though it was a 2-week trial. And the record, I think, when reviewed, shows that 90% of the... probably the evidence before the court went to the test itself and not to alternatives. But the record is devoid of any proof of any alternative that's equally valid and less discriminatory. Go ahead. The only one that the plaintiff could arguably say would be the 96 test. And what is to be done with the use of the results of the 96 test, which arguably was more successful in the sense that it showed less adverse impact? Your Honor... Or perhaps no adverse impact. I don't know. I don't remember exactly. And that's the dilemma that we face, Your Honor, because even though... That's what the courts have said repeatedly. The dilemma we face or the dilemma the city face? Well, it's a dilemma that the courts would face. I'm more concerned about the dilemma we face right now. I want to know what we're supposed to do with that evidence. Well, Your Honor, that's not adequate evidence to establish their burden. As a matter of law. As a matter of law. The Seventh Circuit, in the cases we've cited, the Eleventh Circuit, the Fifth Circuit, have all found that mere suggestions and these proposals that have been put out there are not sufficient to carry the plaintiff's burden. The plaintiff has to show, and they did not show anything except referring to the 96 test and how that would be incorporated in this. If we agreed with your point that the analysis is faulty or the analysis is inadequate, then we would have to go back through the record to see... I mean, we would do it, obviously, but we'd be going back through the record to see whether it would... It wouldn't be appropriate for us to get down in the record and start making fact findings. No, Your Honor, that is correct. But the record is devoid of two things. One, that there was proof about that the 96 test, if there was any proof of the 96 test, how that would apply, how that could have made this test better. Which causes me to wonder whether or not the experts, either or both, in the consultations in front of Judge McCalla before okaying the new test, discussed the benefits of the 96 test that showed little adverse impact. Well, the discussion of the 96 certainly was not specifically discussed. In designing the test, did either expert refer to... Remember back when we had that 96 test, that one... Well, the issue would have been, because the portion of the 96 test, the role playing, was called high fidelity. That was discussed in the hearings in front of Judge McCalla. And the city said that because of the security issues that we had, because this is a test, and I try to say it, it had to be done very quickly with high security. It was the security issue... I'll help you, shortcut. Your time is up. It was the security issue that caused that part of the test not to be included. No, the security issue, Your Honor, was to make sure that the test could be done very quickly and secure. And the only way to do that would be in a video assessment, which was done and approved by Judge McCalla. The role playing that they did in 96 took three weeks, over three weeks to administer. But he thought that wasn't manageable. That was not manageable. It was not approved by Judge McCalla because... The plaintiffs knew this too. Absolutely. Go ahead, Julie. I want to make sure I understand real quickly. The 96 test was considered as an alternative in connection with the approval of the later test or was really only a matter of proof at trial? The 96 test did not come up until trial. Okay. But the high fidelity versus low fidelity is what they call the lingo. That general methodology did come up. That did come up and that was considered and everybody was on board that it would be a low fidelity testing. The video assessment would be the format. Is there anything else? No. Okay. All right, Mr. Sullivan. Thank you. I'd like to direct the Court to the third brief of the plaintiffs, in particular on page one, because it has the quotes from the June 27, 2001, status conference in front of Judge McCalla. At that time, the City Council has declared this is not a collaborative effort to come up with a new test that everyone can agree to. The limited purpose is to share information about how the City was going to proceed. The City's Council told the Court, I don't think the City has ever requested that it be approved by the Court. This is the City's process and the City understands the risk of going forward. In the December 2002 hearing in front of Judge Donald, the City said that it intended to proceed with promotions despite the adverse impact. And at that point, the City presented its expert who said he had thought long and hard about this test and couldn't come up with any reason to explain the outcome. He was then asked if he'd consider a practical test, a practical test like the City had given. The high fidelity, low fidelity. Yes, it's called a practical test, a work sample, a performance test, but it's in a high fidelity test. He said he was not even aware the City had given such a test in 1996. I'd just ask Mr. Britt about this, about whether this was discussed in the development of the new test. I thought the answer was yes. Was it discussed in the development of the new test with who? With the parties in front of Judge McCullough. Well, first off, there was a discussion about what the City intended to do, but the City made it very clear they were not open to suggestions. But we also heard from Mr. Britt the reason for that, that it was a three-week process of acting and it was so easily compromised that that was rejected by the City. I'm not sure what your plaintiff's objection, did they object? The plaintiffs urged the City to use a practical test, but the City made it clear they didn't want input, and at that point there was only one group of plaintiffs, and that was the Johnson Group. So your expert was considered, I mean, in terms of input by the court? Our expert was able to confer with the City's expert who had already set out on a plan. I see. He was not allowed to say... I don't want to detain you. You have many things to say. With respect to whether or not there's evidence in the record, the Judge's findings of fact established that the 1996 test was an available alternative. In fact, the City's expert told her that there were no alternatives in that December 2002 hearing. In fact, there were three alternatives. There was the 1996 test, there were tests of integrity and conscientiousness, and there was also a test that he had developed himself and used in the City of Chicago. He didn't mention any one of those three alternatives, and Judge Donald's findings that said the fact that these alternatives exist belie his contention that there were none. Now, the 1996 test was certainly a very viable alternative that was discussed. The evidence consisted of the... Your argument is that it was very viable, and in view of the compromising that took place that caused the invalidation of the 2000 test, do you still maintain that it was very viable? Yes. When that is seen to me, precisely why? Yes. Well, I can refer the Court to Dr. Jones' testimony, the developer of the... Can you just tell us where to look, why you say that? That's what I was looking for. Dr. Jones testified that he was aware of the errors in the administration of the test in 1996, but he specifically said those errors were controlled and did not affect the outcome of the test. Now, in contrast, the 2000 test was compromised, the video test was compromised so seriously that the City agreed, in response to our motion for partial summary judgment, that it was invalid. Now, the 1996 test, and I'll... Oh, here it is. It's page ID 6462 and 6455, in which Dr. Jones, the City's expert and developer of the 1996 test, said he was aware of it and they would take precautions in the next test to prevent that from happening. The next test was the 2000 test, and the 2000 test was a video test, and it was compromised. Now, the 1996 test evidence was in the record. The validation report from the 1996 test is in the record. That validation report said that it was valid and met all legal requirements, including the City's laws. It had less adverse impact. Our experts showed that, in comparison of the 1996 test to the 2002 test, that the adverse impact was substantially less. So we have carried our burden of proof to show that there was an available alternative, that there was an alternative that actually had been demonstrated to produce less adverse impact, and further, we proved that the City defended the case in an arbitration proceeding brought by the Union, saying that the practical test was essential to reduce adverse impact and to establish validity, the job relatedness of the test, because the sergeant's job in Memphis was so broad that it could not be measured simply by a written test alone. I see that my time is up. Anything else, Mr. Zeller? All right, Mr. Britt. Thank you, Your Honor. I apologize for trying to speak so quickly, but there's a lot of issues to try to cover. But I do want to answer the Court's inquiry, and Judge Cook asked about the high fidelity. On page 36 of Dr. Jenrette's report that was approved by Judge McCullough, it's ID 8135, he goes through and says several alternatives, such as oral interviews, individual assessment techniques, personality measures, high fidelity work samples involving role play were not feasible because of constraints. That was not an available alternative. Even if the Court were to consider, which I do not believe is the correct standard, what Judge Donald found that a broad suggestion is carrying the plaintiff's burden of an alternative, even if the Court was going to find that to be correct, there was no assessment that anything was available. And that is the key. I direct the Court's attention, or at least inquiry, is to looking at the Seventh Circuit cases in Adams and Allen and those involving the City of Chicago where there was a merit selection proposal and the Court said it wasn't available to the City at the time of the promotions. Therefore, it's not an alternative. It's not an available alternative, and that's the case here. There was no analysis that even the 96 test was an available alternative under the constraints we had in this case. That's noted by Judge McCullough over and over again about the test security. So if Judge Donald's standard that she has in her memorandum of opinion is allowed to stand, what that would say is we welcome second-guessing, Monday-morning quarterbacking. Wait until after the test is done. Come in and throw a broad suggestion. Oh, yes, you could have used this. That's not sufficient. That doesn't meet the burden that the plaintiff has. The statutory scheme provides that they have a burden to show an alternative, and they did not do it. Thank you very much. We appreciate the arguments both of you have made, and we'll consider the case or cases or whatever, however we term it, carefully. Thank you. Thank you.